## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTAL DODSON, o.b.o. B.B., | ) | |
| | ) | CASE NO.  3:15CV0497 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | MAGISTRATE JUDGE GREG WHITE |
| Security, | ) | |
| | ) | |
| Defendant. | ) | **MEMORANDUM OPINION & ORDER** |

Plaintiff Christal Dodson ("Dodson"), on behalf of her minor son, B.B, challenges the final decision of the Acting Commissioner of Social Security Carolyn W. Colvin ("Commissioner"), denying B.B.'s claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. § 1381 *et seq*.  This matter is before the Court pursuant to 42 U.S.C. § 405(g) and the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

For the reasons set forth below, the final decision of the Commissioner is VACATED and the case is REMANDED for further proceedings consistent with this Opinion.

### I. Procedural History

On February 7, 2012, Dodson filed an application for SSI on behalf of her son B.B, a child under the age of eighteen, alleging a disability onset date of November 28, 2005 and claiming B.B. was disabled due to Attention Deficit/Hyperactivity Disorder ("ADHD") and a learning disability.  (Tr. 75, 174.)  The application was denied both initially and upon reconsideration.  (Tr. 96-98, 105-111.)  Dodson timely requested an administrative hearing.

On September 26, 2013, an Administrative Law Judge ("ALJ") held a hearing during which B.B., represented by counsel, and Dodson testified.  (Tr. 28-74.)  On November 14, 2013, the ALJ found B.B. did not have an impairment or combination of impairments that met or functionally equaled the listings.  (Tr. 9-23.)  The ALJ's decision became final when the Appeals Council denied further review.  (Tr. 1-3.)

## II. Evidence

### Personal Evidence

B.B. was born on May 1, 1998, and was a fifteen year old "adolescent" pursuant to 20 CFR § 416.926a(g)(2) at the time of the administrative hearing.  (Tr. 34.)

### Medical Evidence

B.B. began treatment with family practitioner Tricia Vandehey, D.O. , for attention-deficit symptoms in November 2005, when he was seven years old and in the first grade.  (Tr. 395-396.)  At that time, Dr. Vandehey noted Conners scores[1] from both B.B.'s mother and teacher that showed "definite areas of attention deficit and inattentiveness, hyperactive and impulsivity, positional risk patterns."  (Tr. 395.)  Dr. Vandehey assessed attention deficit hyperactivity disorder ("ADHD") "per clinical history, not confirmed with psychological testing;" prescribed a low dose of Strattera; and, recommended Dodson arrange for B.B.'s school to conduct a full psychological evaluation.  (Tr. 396.)

The record reflects that, between November 2005 and February 2012, B.B. returned to Dr. Vandehey for numerous follow-up appointments regarding his ADHD.  (Tr. 320-399.)  Dr. Vandehey's treatment notes indicate B.B.'s symptoms fluctuated during this time period.  On February 10, 2006, Dr. Vandehey noted B.B. was having "a lot of trouble paying attention and

---

[1] The Conners Rating Scale collects answers from parents and teachers in order to create a comprehensive inventory of a child's behaviors. The Conners test helps to measure hyperactivity; provide a perspective on a child's behavior from those who interact closely with the child on a regular basis; and, establish a baseline before beginning therapy and medications. *See*: http://www.healthline.com/health/adhd/conners-scale#2.

sitting still during activities." (Tr. 381.) She further observed that, during the office visit, B.B. was "just all over the room, unable to sit still, just very high-strung." *Id*. Dr. Vandehey prescribed Adderall XR 10 mg. *Id*.

The medication appeared, at first, to be helping to control B.B.'s symptoms. On March 22, 2006, Dr. Vandehey noted that "in this last 9 weeks of school [B.B.] made the honor roll and he seems to be doing really well at school." (Tr. 388.) She also stated B.B. was not having difficulties at home and "mom has not really heard much from the school as far as any negative reports." *Id*. B.B. appeared to continue to do well over the summer of 2006, even after his mother discontinued some of his medication. (Tr. 385.)

In October 2006, however, Dodson reported to Dr. Vandehey that B.B. was "just not doing well at school." (Tr. 383.) Dr. Vandehey's notes indicate B.B. was having trouble staying on task, citing information provided by the school that B.B. had been distracted 12 out of 20 minutes during a writing project. *Id*. Dr. Vandehey continued B.B. on Adderall XR 10 mg and added Strattera. *Id*. The following month, Dr. Vandehey increased B.B.'s Adderall dosage to 20 mg. (Tr. 382.)

At his next visit with Dr. Vandehey, on March 16, 2007, Dodson brought in school paperwork "which does show that [B.B.] is having issues almost daily" with "blurting out in class and staying off-target." (Tr. 375.) Dodson reported the increased Adderall "really did not help at all." *Id*. Dr. Vandehey discontinued the Adderall, and prescribed Concerta. *Id*. Seven months later, in October 2007, Dodson reported to Dr. Vandehey that she was not sure whether the Concerta was helping. (Tr. 373.) Dr. Vandehey's notes indicate B.B.'s grades had fallen (to C's and D's); however "mom is not getting as many reports that he is acting up in school." *Id*. Dr. Vandehey continued B.B. on Concerta and Strattera. *Id*.

On December 10, 2007, Dr. Vandehey stated that B.B. "is not doing as well in school," and "for the most part he still struggles with reading and spelling and does take specialized classes for this." (Tr. 371.) She did note some improvement in that the school had not reported

3

disciplinary problems; however, Dr. Vandehey stated B.B.'s "focus and ability to get things done is not ideal." *Id*.  Dr. Vandehey increased the dosage of Concerta.  *Id.*

B.B. returned to Dr. Vandehey on April 29, 2008.  (Tr. 368.)  At that time, Dodson reported that B.B.'s "grades are doing well" and he is "doing better every day in school."  *Id*. However, she also stated that B.B. was having behavioral issues at home and suffering from "mood fluctuations."  In particular, Dr. Vandehey noted Dodson's reports that B.B. "gets very easily agitated and cries frequently for no reason."  *Id.*  Dr. Vandehey continued B.B. on Concerta and Strattera, and added a low dose of Prozac.  *Id.*

On June 6, 2008, B.B. presented to Dr. Vandehey with numerous behavioral issues.  (Tr. 366.)  Dr. Vandehey's treatment notes state "[B.B.'s] behavior has just gotten out of control." *Id.*  She noted that B.B. (who was then 10 years old) was suspended from school for three days after stealing a laptop, and that he was reportedly "choking kids and picking at kids and just getting in trouble."  *Id.*  Dr. Vandehey discontinued the Prozac, and referred B.B. for a psychiatric evaluation "because his behavior is beyond my comfort level of managing his meds." *Id*.

In September 2008, Dodson reported she had discontinued B.B.'s medications over the summer and had not yet started his medications for the school year.  (Tr. 363.)  B.B. was started back on Concerta.  *Id*.  In October 2008, Dr. Vandehey noted B.B. was again having difficulty at school, particularly with focus and attention.  (Tr. 361.)  Dr. Vandehey also stated that Dodson reported aggressive behavior, including "the fact that she had to call the police the other day as [B.B.] had been very threatening and causing great issues to his little brother the other day to the point where she had to call the police to get his anger under control."  *Id.*  Dr. Vandehey continued B.B. on Concerta; discontinued the Strattera; and, prescribed a low dose of Risperdal. *Id*.

By November 2008, Dr. Vandehey's notes indicate B.B. "seems to be doing better at school."  (Tr. 359.)  She noted he had had "more good days than bad," and Risperdal seemed to

be improving his sleep.  *Id.*  Dr. Vandehey "did express the necessity for him to get this medicine every day as I think there has been questions of whether or not he is getting his medicine on a regular basis."  *Id.*  B.B. was continued on his same medicine regimen.  *Id.*

At his next visit, in February 2009, Dr. Vandehey stated that B.B. "has seemed to do quite well since our last visit,"  noting that Dodson had not had any reports from school and "his grades seem to be doing well."  *Id*.  B.B. was reported as doing well during office visits in May and August 2009, at which time Dodson stated that "overall [B.B.] has been fairly well" and "she has not had any complaints from his teachers."  (Tr. 355, 353.)

B.B. next returned to Dr. Vandehey on November 16, 2009.  (Tr. 350.)  At that time, he was reported as "doing well at school" and not having any "significant issues with regards to his medication."  *Id*.  However, Dodson was concerned because B.B. had fainted.  *Id.*  Dr. Vandehey noted B.B. was pale and lethargic, and complaining of a "pretty bad headache."  *Id.*  Dr. Vandehey sent B.B. to the emergency room for hydration.  *Id.*  At a follow-up visit two days later, Dr. Vandehey concluded B.B. was much improved, in terms of his blood pressure, pallor, and activity level.  (Tr. 351.)  With regard to his ADHD, Dodson reported she had just received B.B.'s IEP from the school and was again concerned about his grades, focus, and attention.  *Id*.  Dr. Vandehey increased the dosage of B.B.'s Concerta.  *Id*.

Records from the Defiance Clinic indicate B.B. passed out at school again, on December 14, 2009.  (Tr. 349-350.)  It appears Dr. Vandehey subsequently referred B.B. to a pediatric cardiologist.  (Tr. 347.)  Treatment notes from February 15, 2010 indicate B.B. was "recently diagnosed with neurocardiogenic syncope," and "the fact that he has passed out on a couple of occasions at school has been an issue."  (Tr. 344.)  With regard to B.B.'s ADHD, Dodson reported he was no longer doing well at school and was showing "aggressive tendencies at home."  *Id*.  Dr. Vandehey continued B.B. on Concerta and increased his Risperdal dosage.  *Id*.

Dr. Vandehey's notes from April 2010 indicate B.B.'s "Concerta seems to be keeping him fairly stable at school," although he still showed "aggressive tendencies at home."  (Tr. 341.)

Dr. Vandehey continued B.B. on Concerta; discontinued the Risperdal; and, prescribed Abilify. *Id.*  On October 11, 2010, Dr. Vandehey noted that Dodson "states overall [B.B.] is not doing well in school . . . [and] is having issues with his grades."  (Tr. 337.)  Dodson also reported B.B. was "constantly fighting" with his brother, although Dr. Vandehey thought "this is pretty typical of siblings." *Id.*  Dr. Vandehey again increased B.B.'s Concerta dosage.  *Id.*

B.B. returned to Dr. Vandehey on January 3, 2011.  (Tr. 335.)  At that time, Dr. Vandehey noted that "I had given him an increased dose of Concerta in October, and they [i.e., his parents] did not follow up as recommended."  (Tr. 335.)  During this visit, Dodson reported B.B. was failing two subjects and was very emotional, agitated, and angry.  *Id.*  Dr. Vandehey again modified B.B.'s medications, this time by discontinuing the Concerta, increasing the Abilify dosage, and prescribing Vyvanse.  *Id.*  Three weeks later, on January 26, 2011, Dodson reported to Dr. Vandehey that B.B. was "not passing school" and "will more than likely fail sixth grade." (Tr. 333.)  Dr. Vandehey increased the Vyvanse dosage.  *Id.*

On February 28, 2011, Dodson expressed to Dr. Vandehey her continued concern regarding B.B.'s performance at school.  (Tr. 331.)  Dr. Vandehey's treatment notes state the following:

> This is a 12 year old male who comes in today for a one-month follow up. Mother states he is failing practically every subject in school.  His issue I think is that he does not turn in his homework assignments, he does not bring homework assignments home.  Mother states the school has not really related any issues with them about his behavior nor that he is having difficulty with focus and attention, that he just does not get his assignments turned in.  I had a very lengthy discussion with mother.  I advised her that no matter what we do medication wise, I do not think that is going to change his behavior.  I think this is probably more of a behavioral issue, just that he has a lack of effort in school.

*Id.*  Dr. Vandehey further noted that B.B. does not act out at school, and characterized his fighting with siblings as "typical for a kid his age."  *Id.*  She concluded B.B. needed more aggressive intervention and offered to contact the school herself.  *Id.*

On May 27, 2011, Dodson reported that B.B. was failing the 7th grade.  (Tr. 328.)  Dr. Vandehey encouraged Dodson to communicate more frequently with the school and "to get more

6

actively involved with him trying to pass his classes." *Id.*  In August 2011, Dodson indicated

B.B. was able to pass the 7th grade, and she had taken him off the Vyvanse over the summer

months.  (Tr. 326.)  Dr. Vandehey advised Dodson to restart B.B. on his medications.  *Id.*

On November 9, 2011, B.B. and Dodson presented to Neil S. Shamberg, Ph.D., for a

consultative examination.  (Tr. 312- 315.)  At the outset, Dr. Shamberg noted no psychological

testing was conducted as part of the examination and, further, that "most of the information

provided here came from the claimant [B.B.] and from his mother."  (Tr. 312.)  Dr. Shamberg

recounted B.B.'s developmental, health, and educational history, including the fact that he had

been in special education classes throughout his school years.  (Tr. 313.)  Dr. Shamberg then

recorded his own mental status and behavioral observations, as follows:

> [B.B.'s] medication (Vyvanse) had long worn off and he seemed jittery,
> distractible, inattentive, unfocussed, eager to leave, and said: 'I want to go home,
> I'm hungry and I want to get out of here.'  At home he refuses to do most chores,
> but he will wash some dishes occasionally, mother said; she told me: 'If I stand
> over him I can get him to pick up his room, do some homework; he likes playing
> with the dogs, he walks the two dogs, takes care of them.'  During the evaluation, I
> noticed that [B.B.], for the most part, sat still in his chair, but squirmed around; he
> spoke out of turn, he interrupted me, he looked out the window; he was distracted
> by most outside street noises, and he fidgeted with things on my table and on my
> desk.  He apologized for some of his behavior, but kept on doing it; he was rude
> several times to his mother.  He never broke down and cried; he never appeared to
> me to be depressed, fearful, anxious, etc.

(Tr. 314.)

Dr. Shamberg assessed ADHD, Oppositional Defiant Disorder, and Borderline

Intellectual Functioning; and assigned a Global Assessment of Functioning of 50.[2]  *Id.*  Dr.

---

[2]  The GAF scale reports a clinician's assessment of an individual's overall level of functioning.
*Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (American Psychiatric
Association, 4th ed. revised, 2000) ("DSM-IV").  An individual's GAF is rated between 0-100,
with lower numbers indicating more severe mental impairments.  A GAF score between 41-50
indicates serious symptoms or any serious impairment in social, occupational or school
functioning.  DSM-IV at 34.  It bears noting that a recent update of the DSM eliminated the
GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in
routine practice." *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16
(American Psychiatric Association, 5th ed., 2013).

Shamberg then opined that B.B. would be (1) severely limited with regard to his ability to acquire and use information relative to other children his own age now; (2) severely limited with regard to his ability to attend and complete tasks; (3) moderately to severely limited with regard to his ability to interact with and relate with others; and, (4) moderately limited with regard to self-care.  (Tr. 315.)

B.B. returned to Dr. Vandehey several weeks later, on November 22, 2011.  (Tr. 323.)  At that time, Dodson reported that, "as far as school work is doing, [B.B. is] doing actually relatively well and getting reasonable grades."  *Id*.  Based on this report, Dr. Vandehey concluded that "I think we have this focus issues fairly well improved."  *Id*.  However, B.B.'s behavior at school had deteriorated and he was getting "lots of detentions."  *Id*.  Dr. Vandehey "advis[ed] mom that some of this is behavioral in nature so medication may or may not help with this situation, and just continued behavioral modification recommendations were given to mom."  *Id.*  Dr. Vandehey continued B.B. on Vyvanse, and prescribed Clonidine to address B.B.'s behavioral issues.  *Id.*

On February 20, 2012, Dodson reported to Dr. Vandehey that she believed the Clonidine had not made any difference.  (Tr. 320.)  Dodson indicated that the "school is still having issues with him getting in trouble frequently . . . [and] the school feels that he is unable to control his behavior and that he is not doing it intentionally."  *Id.*  Dr. Vandehey noted that "[a]t this point, as we have tried multiple different therapeutic modalities and I have not seen a whole lot of improvement, I did suggest to her that we set him up to see the psychiatrist for a medication opinion."  *Id.*  Dr. Vandehey diagnosed ADHD, behavioral disorder, and probable learning disability; and, referred B.B. to child psychiatrist Teymour Sepahbodi, M.D.  *Id.*

Dr. Sepahbodi conducted a psychiatric evaluation of B.B. on February 28, 2012.  (Tr. 410-413.)  Dr. Sepahbodi found B.B. to be cooperative and alert, with an appropriate affect.  (Tr. 412.)  He described B.B.'s memory, orientation, progression, language, and perception as "normal."  *Id*.  Further, he assessed B.B.'s mood as anxious and sad, and his insight and

8

judgment as "fair." *Id*. Dr. Sepahbodi diagnosed ADHD and Oppositional Defiant Disorder; and, assessed a GAF of 40. (Tr. 413.) He prescribed Vyvanse, Clonidine, and Risperdal. *Id*.

B.B. returned to Dr. Sepahbodi on April 10, 2012, at which time he was described as "doing okay" with "only one D in history." (Tr. 409.) Dr. Sepahbodi referred B.B. to Harbor Behavioral Services for counseling.[3] *Id.*

Dr. Sepahbodi thereafter completed a Mental Status Questionnaire on May 21, 2012. (Tr. 429-433.) He found B.B. had good orientation, appearance, and flow of conversation. (Tr. 429.) He further assessed that B.B. had a stable mood and affect with no anxiety, but minimal insight and judgment. *Id*. Dr. Sepahbodi noted a diagnosis of ADHD and described B.B. as hyperactive. (Tr. 429-430.) He concluded B.B. had a "good" ability to remember, understand, and follow directions. (Tr. 430.) When asked to describe B.B.'s abilities to "maintain attention" and "sustain concentration, persist at tasks, and complete them in a timely fashion," Dr. Sepahbodi simply responded "no." *Id*. He also indicated that B.B.'s impulsiveness and hyperactivity impacted his social interaction and adaption. *Id*. Finally, when asked how B.B. would react to the pressures involved in simple, routine, or repetitive tasks, he responded "not good." *Id*.

B.B. returned to Dr. Sepahabodi for follow-up visits in June, August, October, November and December 2012, and in January, May, and June 2013. (Tr. 409, 666-667, 741.) Dr. Sepahbodi's notes (which are fairly cursory) indicate B.B. was doing "ok" throughout most of 2012. However, in December 2012, Dr. Sepahbodi states that B.B. "continues to be a behavioral problem." (Tr. 666.) In January 2013, Dr. Sepahbodi observes that B.B. "is not doing the work and grades are not so good." *Id*. In May 2013, however, Dr. Sepahbodi indicates B.B. was "doing ok" and finishing up the 8th grade. *Id.*

---

[3] The record reflects B.B. attended counseling sessions at Harbor Behavioral with Lori Price-Hull ISW-S and Susan Lane-Baldwin from May 2012 until July 2013. (Tr. 415-427, 668-689, 742-751.)

*Educational Records*

B.B.'s educational records show a long history of teacher concerns regarding his lack of focus and self-control. As early as kindergarten, B.B's teacher noted that he "needs to focus on self-control." (Tr. 499.) B.B.'s first grade teacher observed that he "has a difficult time staying focused on his lessons" and "continues to interrupt during class." (Tr. 497.) In second grade, B.B. appeared to have particular difficulty with his grades, getting F's in both reading and math.[4] (Tr. 494.) His teacher that year stated that B.B. "is having trouble paying attention in class (even with the increased medicine)." (Tr. 495.) She also noted that "[a]s the school year came to an end, [B.B.] has had difficulty paying attention, staying focused, and finishing his assignments." *Id*.

In the third grade (the 2007 to 2008 school year), B.B. was referred for a special education evaluation "due to off-task behaviors and lack of work completion." (Tr. 506.) In October 2007, B.B. was administered the Wechsler Intelligence Scale for Children- IV ("WISC-IV") and found to have a Full Scale IQ of 78, which falls in the Borderline range.[5] (Tr. 550.) B.B. was also administered the Behavior Evaluation Scale-Second Edition ("BES") and the Attention Deficit Disorders Evaluation Scale- Second Edition ("ADDES-2"). (Tr. 556-557.) With regard to the BES, B.B. was evaluated as "atypical" or "at-risk" for learning problems

---

[4] There is also evidence in the record that B.B. exhibited behavioral issues during second grade (the 2006 to 2007 school year), particularly with respect to his behavior on the school bus. Specifically, in September 2006, B.B. hurt another child on the bus and "made her cry." (Tr. 616.) In November 2006, B.B. was placed on bus probation because he "will not stay in his seat" even after several warnings. (Tr. 614.) In December 2006, B.B. was denied bus privileges for ten days because he "will not stay in his seat and will not listen." (Tr. 611-12.) B.B. was denied bus privileges again in March 2007, because he was "very agitated and will not sit down." (Tr. 610.) Finally, in May 2007, the school revoked B.B.'s bus privileges for the remainder of the school year because "he had a basketball on the bus and was hitting the window with it [and] he will not stay in his seat." (Tr. 608.)

[5] BB. was also found to have a Verbal Comprehension Index of 83 (Low Average); a Perceptual Reasoning Index Score of 92 (Average); a Working Memory Index of 83 (Low Average); and, a Processing Speed of 70 (Borderline). (Tr. 550.)

(including difficulty attending to task), inappropriate behaviors, and unhappiness/depression.

(Tr. 556.) With regard to the ADDES-2, B.B. was evaluated as follows:

> In the area of Inattentiveness, [B.B.] consistently engages in the following behaviors: is easily distracted by other activities in the classroom; does not listen to what is being said; does not direct attention to important sounds in the environment; needs questions repeated; has difficulty concentrating; loses his place when reading; fails to copy information from the board or textbook; does not perform or complete classroom assignments during class time; is disorganized; fails to perform assignments independently; does not prepare for school assignments independently; does not remain on task; fails to make use of study time; fails to follow necessary steps; and changes from one activity to another without finishing first.
>
> In the area of Hyperactivity/Impulsivity, [B.B.] consistently engages in the following behaviors: begins assignments before receiving directions; fails to follow a routine; leaves seat without permission; handles objects; and moves about unnecessarily.

(Tr. 557.)

   As a result of this evaluation, an IEP was developed for B.B., effective November 2007 to November 2008.  (Tr. 568-578.)  In the areas of written expression, reading comprehension, math, and work study, B.B. was provided with a number of accommodations, including specialized instruction in the intervention classroom and/or regular education classroom; small group setting instruction; extra time to complete tasks; modified tests; and, frequent breaks.  (Tr. 570-578.)

   In terms of his grades, B.B. appears to have benefitted somewhat from these accommodations, as his year-end third grade report card reflects he received an A- in reading, spelling, and math; B+ in written expression; C in social studies/citizenship; and C- in science/health.  (Tr. 492.)  However, the record also contains evidence of behavioral issues during B.B.'s third grade year.  Specifically, the record reflects that, in June 2008, B.B. was suspended for three days for stealing a school laptop.  (Tr. 617-618.)

   When B.B. was in fourth grade (the 2008 to 2009 school year), he continued to receive direct instruction in the resource room for reading, spelling, English and math; and, instruction in the regular classroom for science and social studies.  (Tr. 531-538.)  There is also continued

11

evidence of behavioral issues in class, including an October 2008 letter from the school to

Dodson expressing concern regarding B.B.'s "erratic behavior." (Tr. 630.)

In fifth grade (the 2009 to 2010 school year), B.B. continued to receive instruction in the

resource room for reading, spelling, English and math; and, was "mainstreamed" for science and

social studies. (Tr. 516.) In his IEP for that year, it is noted that B.B. has trouble staying seated

during class time; forgets his work and notebooks, and "gets off task easily." (Tr. 517.) It is

further noted as follows:

> With social issues, [B.B.] gets off task easily in all the rooms. One teacher stated
> he only socializes with 1 or 2 students, while another teacher says he gets along
> well with all his classmates and seems to fit in. [B.B.] receives many other
> modifications and accommodations from his teachers that are not usual ones on an
> IEP. He is getting peer tutoring, copied notes, preferential seating, permission to
> correct work with notebooks and books, is given study guides, and many others.
>
> [B.B.] has difficulties in social studies and science because of the 'at to above'
> reading level required of him, which is two to three years above his reading level.
> Additionally, [B.B.] has difficulty in the regular education large group setting. In
> this setting there are more distractions and less opportunity for intensive direct
> instruction and guided practice. All the tests and quizzes have been modified all
> year.

*Id.* B.B.'s fifth grade report cards reflects that he received the following year end grades: a C in

reading; D in spelling; D+ in English; C in math; C in science/health; and D+ in social

studies/citizenship. (Tr. 488.)

An Evaluation Team Report ("ETR") was completed in the fall of 2010, when B.B. was

entering the sixth grade. (Tr. 192-220.) As part of this evaluation, B.B. was again administered

the WISC-IV. (Tr. 204-205.) This test revealed that B.B. had a Full Scale IQ Of 72, which falls

within the Borderline Range.[6] *Id.* B.B. was also administered the Behavior Assessment System

for Children- Second Edition ("BASC-2"), which is an "integrated system designed to facilitate

the differential diagnosis and classification of a variety of emotional and behavioral disorders of

---

[6] B.B. was also found to have a Verbal Comprehension score of 81 (Low Average); Perceptual
Reasoning Score of 79 (Borderline); a Working Memory score of 80 (Low Average); and, a
Processing Speed of 68 (Extremely Low). (Tr. 204.)

children." (Tr. 207.) According to this assessment, B.B. was rated to fall within the typical range for hyperactivity and conduct problems, but in the at-risk range for aggression. *Id.* Specifically, B.B. was reported by his teacher "to lose his temper easily; and sometimes to annoy others on purpose, teases others; defies teachers; argues when denied his own way; bullies others; and call others names." *Id.* B.B. was also assessed as falling within the at-risk range for attention problems. *Id.* It was noted that B.B. is "easily distracted from class work, and sometimes listens to directions, does not pay attention to lectures, [and] has a short attention span." (Tr. 208.) It was determined that B.B. would benefit from access to a small group instructional setting; extended time to complete tasks; opportunities for redirection and prompting; and, social skills instruction "to improve his peer relations." *Id.*

B.B.'s IEP for sixth grade (the 2010 to 2011 school year) again notes that B.B. "has trouble with organization, completing work in and out of the classroom, and focusing on the task at hand." (Tr. 505.) He was provided a variety of class room and testing accommodations, consistent with his previous IEPs. (Tr. 510, 513.) B.B.'s year-end grades for sixth grade were as follows: a C in English; C in math; A+ in physical education; D+ in reading; F in science; F in social studies; F in computer; and A in Choir. (Tr. 436.)

In seventh grade (the 2011 to 2012 school year), B.B. was again in the resource room for all of his core subjects, and in the regular education classroom for his electives. (Tr. 182.) B.B.'s IEP for this school year notes that: "[B.B.] has trouble completing work both in and out of the classroom. He is easily distracted, and has trouble staying focused long enough to complete an assignment. He requires a lot of teacher redirection, and a quiet and calm work environment." (Tr. 185.) B.B. was again provided with a panoply of accommodations, including "test read aloud in a small group setting," redirection, "breaks for tasks that are long," and "assignments will be chunked into manageable tasks." (Tr. 186.) The record reflects that B.B.'s semester two grades for the seventh grade were as follows: a C in language arts; C- in math; C- in science; and B- in history. (Tr. 434.)

13

B.B.'s IEP for the eighth grade (the 2012 to 2013 school year) indicates that he was in regular education math and language arts classes with intervention resources; an intervention history class; an inclusion setting for science; and, in regular education classes for his electives. (Tr. 698.)  An ETR was conducted during this time frame.  (Tr. 716-739.)  One of his teachers found that B.B. "wiggled a lot in his seat," but otherwise his behavior was appropriate.  (Tr. 733.) Other teachers found that B.B. "struggles immensely with organization;" "needs constant redirection;" and, is "very easily distracted and struggles to focus all of the time."  (Tr. 734.) With regard to B.B.'s social/emotional status, the ETR noted that he "does demonstrate concerns with hyperactivity, aggression, and conduct problems in comparison to other students his age." (Tr. 735.)  Concerns were also noted regarding anxiety, learning problems, and attention problems.  *Id.*

Finally, the record contains a letter dated September 13, 2013 from B.B.'s Intervention Specialist, Julie Brown.  (Tr. 287.)  This letter states, in pertinent part, as follows:

> I have been [B.B.'s] teacher since August 21, 2013. [B.B.] displays off task behaviors during class.  During a five minute time period, I redirected [B.B.] to task 21 times either verbally, through facial expressions, or by quietly tapping on his paper on the desk. [B.B.] is very apologetic when I direct him back to task.  He makes eye contact with me and apologizes for his lack of attentiveness.  He is a kind young man and I believe that he wants to do well in school. As a result of his off task behavior he is not completing his school work, therefore, he is failing his classes.  Academically [B.B.] is placed in appropriate classes. His failing grades are not a result of his ability level, but rather a result of his inattentive behavior.

*Id.*

### State Agency Opinions

On May 23, 2012, state agency psychologist Bruce Goldsmith, Ph.D., reviewed B.B.'s records and conducted a childhood disability evaluation.  (Tr. 79-80.)  Dr. Goldsmith found that B.B. had less-than-marked levels of limitation in acquiring and using information; attending and completing tasks; interacting and relating with others; and, caring for oneself.  *Id.*  He also concluded that B.B. had no limitation in moving about and manipulating objects, or health and physical well-being.  *Id.*

14

On October 24, 2012, state agency psychologist Jennifer Swain, Psy.D., reviewed B.B.'s records and conducted a childhood disability evaluation. (Tr. 90-91.) Dr. Swain reached the same conclusions as Dr. Goldsmith. *Id.*

### Hearing Testimony

During the hearing, Dodson testified as follows:

- B.B. is currently 15 years old and in the 9th grade. (Tr. 34.) He started showing signs of hyperactivity and an inability to focus when he was three years old. (Tr. 45-46.) Dodson sought assistance from Head Start during the time period that B.B. was three to five years old. *Id.* When B.B.'s kindergarten teacher also noticed problems with hyperactivity, Dodson brought him to the doctor for an evaluation. *Id.* B.B. was placed on medication when he was in first grade. (Tr. 47.)

- B.B. has difficulty sitting still. (Tr. 39.) He cannot sit through a two hour movie. *Id.* He is constantly fidgeting and moving around. *Id.* He can sometimes complete a thirty minute television show. *Id.* The only activities that he can do for longer than thirty minutes are riding his dirt bike and four wheeler. (Tr. 51-52.)

- B.B has difficulty completing chores at home due to his lack of focus. It can take him hours, or even days, to complete a task such as doing the dishes. He constantly has to be reminded to clean up after himself and do his chores. (Tr. 38, 50-51.) He acts immature for his age and can be disrespectful. (Tr. 54.)

- B.B.'s primary problems at school are his inability to stay on task and complete his homework. (Tr. 36.) He has had continued problems with inattentiveness. He constantly has to be redirected to focus on his homework. At school, he doodles instead of paying attention to his teachers. (Tr. 40.) The school believes his inattention affects his ability to complete tasks, which in turn affects his grades. (Tr. 42.) Dodson believes B.B. is failing every class, although she did state that B.B. has gotten some A's in his intervention classes. (Tr. 41, 49.)

- An individualized education plan ("IEP") was developed for B.B. when he was in the first grade. (Tr. 47.) B.B. gets testing accommodations, such as longer test times and having test questions read to him. (Tr. 48.) He is in both "regular" classes and "small" classes. *Id.* In his main courses, an intervention specialist provides additional assistance. *Id.* B.B.'s teachers say that he is well-mannered and will apologize when corrected. (Tr. 55.) For the most part, B.B. responds correctly around his peers. (Tr. 42.)

- B.B. has been on a variety of medications over the years, including Ritalin, Adderall, Abilify , Risperidone, and Guanfacine. (Tr. 43-44.) Dodson does not think the medications have helped very much. (Tr. 43, 47.) B.B.'s psychiatrist took him off his medications over the summer, and Dodson did not really notice a difference. (Tr. 43.) B.B. was put back on medication in September. (Tr. 44.) His behavior appears to be the same as when he was off medications. *Id.* His

15

medications have, however, helped B.B. sleep. (Tr. 52.) Without his medication, B.B. had difficulty falling asleep and was constantly waking up during the night. *Id*. When taking his medication, B.B. is able to sleep through the night.

B.B. also testified during the hearing, as follows:

- At school, he does not have trouble understanding concepts; he just has trouble paying attention. (Tr. 69.) He has a difficult time sitting still for more than half an hour. (Tr. 63, 68.) He sometimes interrupts his teachers because it is hard for him to control himself to wait and raise his hand. (Tr. 61.) He often has to be redirected at school to stay on task. (Tr. 57.) Sometimes he misses what his teachers are saying because he is not paying attention. (Tr. 70.) He usually does not do his homework because he "will not bring it home." (Tr. 56.)

- He receives a variety of accommodations at school. He takes "modified" tests in English and math. (Tr. 57-58.) These tests are separated into different parts; a teacher will repeat a question if he has trouble understanding; and he is allowed extra time to finish if necessary. (Tr. 58.) There are intervention aides in his math, English and health classes. (Tr. 70.) He is not in a regular science class. (Tr. 59.) He is in "resource science," which has easier work that is done in class. *Id*. He was able to raise his science grade to a C. *Id*.

- He gets angry and sometimes "acts out" and shoves people. (Tr. 62.) He has gotten in trouble for calling people names. *Id*. He does have friends at school, however. (Tr. 70.) For the most part, he does "okay" with people at school. *Id.*

- He cannot sit through a two hour movie. He can watch certain thirty minute television shows, however, and he enjoys riding his dirt bike and four wheeler for up to an hour at one time. (Tr. 67-69.)

- His medications help him sleep. Without his medications, he could not go to sleep and would wake up five to six times per night. With his medication, he falls asleep easily and can sleep through the night. (Tr. 65-66.) Additionally, his medication makes him feel "more mellow." (Tr. 64.) When taking medication, he is more attentive in class and his teachers do not need to redirect him as often. (Tr. 64, 66.)

### III. Standard for Disability

To qualify for SSI benefits, an individual must demonstrate a disability as defined under the Act. "An individual under the age of 18 shall be considered disabled . . . if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C).

To determine whether a child is disabled, the regulations prescribe a three-step sequential

16

evaluation process.  20 C.F.R. § 416.924(a).  At step one, a child must not be engaged in "substantial gainful activity."  20 C.F.R. § 416.924(b).  At step two, a child must suffer from a "severe impairment."  20 C.F.R. § 416.924(c).  At step three, disability will be found if a child has an impairment, or combination of impairments, that meets, medically equals or functionally equals an impairment listed in 20 C.F.R. § 404, Subpt. P, App'x 1; 20 C.F.R. § 416.924(d).

To "meet" a listed impairment, a child must demonstrate both the "A" and "B" criteria of the impairment.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1.  "Paragraph A of the listings is a composite of medical findings which are used to substantiate the existence of a disorder," whereas the "purpose of the paragraph B criteria is to describe impairment-related functional limitations which are applicable to children."  *Id*.  Further, to be found disabled based on meeting a listed impairment, the claimant must exhibit all the elements of the Listing.  *See Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir.  2003); *M.G. v. Comm'r of Soc. Sec.*, 861 F.Supp.2d 846, 855 (E.D. Mich. 2012).

If a child's impairment(s) do not "meet" a listed impairment, the impairment(s) may still be medically or functionally equal to the medical criteria of a listed impairment.  *See* 20 C.F.R. Section 416.926a.  In order to medically equal a Listing, a child's impairment(s) must be substantiated by medical findings at least equal in severity and duration to those shown or described in the listing for that particular impairment.  *Id.  See also Walls v. Comm'r of Soc. Sec.*, 2009 WL 1741375 at * 8 (S.D. Ohio 2009) ("To determine medical equivalence, the Commissioner compares the symptoms, signs, and laboratory findings concerning the alleged impairment with the medical criteria of the listed impairment.")

To determine whether a child's impairment functionally equals the listings, the Commissioner will assess the functional limitations caused by the impairment.  20 C.F.R. § 416.926a(a).  The Commissioner will consider how a child functions in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for [ ]self; and (6) health and

17

physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi). If a child's impairment results in "marked" limitations in two domains, or an "extreme" limitation in one domain, the impairments functionally equal the listings and the child will be found disabled. 20 C.F.R. § 416.926a(d). To receive SSI benefits, a child recipient must also meet certain income and resource limitations. 20 C.F.R. §§ 416.1100, 416.1201.

A "marked" limitation is one which seriously interferes with functioning. 20 C.F.R. § 416.926a(e)(2)(i). "Marked" limitation means "more than moderate" but "less than extreme." 20 C.F.R. § 416.926a(e)(2)(i). "It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." *Id.*

An "extreme" limitation is one that "interferes very seriously with [a child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). An "extreme" limitation means "more than marked." 20 C.F.R. § 416.926a(e)(3)(i). "It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean." *Id.*

If an impairment is found to meet, or qualify as the medical or functional equivalent of a listed disability and the twelve-month durational requirement is satisfied, the claimant will be deemed disabled. 20 C.F.R. § 416.924(d)(1).

### IV. Summary of Commissioner's Decision

The ALJ made the following findings regarding B.B. in the November 14, 2013 decision:

1.  The claimant was born on May 1, 1998. Therefore, he has been an adolescent throughout the time period at issue in this case (20 CFR 416.926a(g)(2)).

2.  The claimant has not engaged in substantial gainful activity at any time relevant to this decision (20 CFR 416.924b and 416.972).

3.  The claimant has the following severe impairments: attention deficit hyperactivity disorder, oppositional defiant disorder, and borderline intellectual functioning (20 CFR 416.924(cc)).

18

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925 and 416.926).

5.  The claimant does not have an impairment or combination of impairments that functionally equals the listings (20 CFR 416.924(d) and 416.926a).

6.  The claimant has not been disabled, as defined in the Social Security Act, since February 7, 2012, the date the application was filed (20 CFR 416.924(a)).

(Tr. 9-23.)  The ALJ found that B.B. had less than marked limitations in the following four domains: acquiring and using information; attending and completing tasks; interacting and relating with others; and, caring for oneself.  (Tr. 17-22.)  He further found B.B. had no limitations in the remaining domains of moving about and manipulating objects; and, health and physical well-being.  (Tr. 21-23.)

### V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also

19

support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. Analysis

### Listing 112.11– Meets or Medically Equals

In her first assignment of error, Dodson argues the ALJ erred in finding that B.B. does not "meet" the requirements of the listing for ADHD, i.e., Listing 112.11. Specifically, Dodson

20

maintains the "administrative record is full of evidence" that B.B. suffers from the paragraph A criteria of this listing, citing evidence from both medical and educational records regarding B.B.'s history of inattentiveness, impulsiveness, and hyperactivity. She further claims the ALJ erred in finding the paragraph B criteria were not met. In this regard, Dodson relies particularly on the opinions of Dr. Sepahbodi and Dr. Shamberg, as well as evidence in B.B.'s educational records regarding his well-documented struggles with focus, inattentiveness, and aggressive behavior. (Doc. No. 11 at 12-15.)

As noted above, at the third step in the disability evaluation process, a child will be found disabled if his impairment meets or equals one of the Listings of Impairments. 20 C.F.R. Section 416.924(d). The Listing of Impairments, located in Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers to "cause marked and severe functional limitations" in children. 20 C.F.R. Section 416.925(a). A child who satisfies the requirements of a Listed Impairment, as well as the durational requirement, will be deemed conclusively disabled and entitled to benefits.

It is well-established that the claimant has the burden to bring forth evidence establishing that his impairments meet, or are medically or functionally equivalent to, a listed impairment. *See Peshek ex rel. N.R. v. Comm'r of Soc. Sec.*, 2014 WL 5684386 at * 13 (N.D. Ohio Nov. 4, 2014); *Franklin ex rel. L.F. v. Comm'r of Soc. Sec.*, 2012 WL 727799 at * 1 (N.D. Ohio Feb. 16, 2012). A claimant must satisfy all of the criteria to "meet" a listing. *See Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009).

Where the record raises a "substantial question" as to whether a claimant could qualify as disabled under a listing, an ALJ must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment. *See Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 3-4 (6th Cir. April 1, 2011); *Smith-Johnson v. Comm'r of Soc. Sec.*, 2014 WL 4400999 at * 5-6 (6th Cir. Sept. 8, 2014); *Taltoan v. Colvin*, 2014 WL 5795561 at * 6 (N.D. Ohio Nov. 6, 2014);

21

*Hunter v. Comm'r of Soc. Sec.*, 2011 WL 6440762 at * 3-4 (N.D. Ohio Dec. 20, 2011). In order to conduct a meaningful review, the ALJ must make sufficiently clear the reasons for his decision. *See Reynolds*, 2011 WL 1228165 at * 4-5; *Taltoan*, 2014 WL 5795561 at * 6; *Marok v. Astrue*, 2010 WL 2294056 at * 3 (N.D. Ohio June 3, 2010); *Waller v. Comm'r of Soc. Sec.*, 2012 WL 6771844 at * 3 (N.D Ohio Dec. 7, 2012); *Keyes v. Astrue*, 2012 WL 832576 at * 5-6 (N.D. Ohio March 12, 2012).

As noted above, Dodson asserts the ALJ erred in determining that B.B. does not "meet" the requirements of Listing 112.11. That listing provides as follows:

> **112.11 Attention Deficit Hyperactivity Disorder: Manifested by developmentally inappropriate degrees of inattention, impulsiveness, and hyperactivity.**
>
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied.
>
> A. Medically documented findings of all three of the following:
>
> > 1. Marked inattention; and
> >
> > 2. Marked impulsiveness; and
> >
> > 3. Marked hyperactivity;
> >
> > AND
>
> B. For older infants and toddlers (age 1 to attainment of age 3), resulting in at least one of the appropriate age-group criteria in paragraph B1 of 112.02; or, **for children (age 3 to attainment of age 18), resulting in at least two of the appropriate age-group criteria in paragraph B2 of 112.02.**

40 CFR Part 404, Subpt P, App. 1, Listing 112.11 (emphasis added). The paragraph B requirements of Listing 112.11 are set forth in Listing 112.02B2, as follows:

> **2. For children (age 3 to attainment of age 18), resulting in at least two of the following:**
>
> a. **Marked impairment in age-appropriate cognitive/communicative function**, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests, or for children under age 6, by appropriate tests of language and communication; or

b. **Marked impairment in age-appropriate social functioning**, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or

c. **Marked impairment in age-appropriate personal functioning**, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, appropriate standardized tests; or

d. **Marked difficulties in maintaining concentration, persistence, or pace**.

40 CFR Part 404, Subpt P, App. 1, Listing 112.02B2.

Here, the ALJ determined, at Step Two, that B.B. suffered from the severe impairments of ADHD, oppositional defiant disorder, and borderline intellectual functioning. (Tr. 12.) Proceeding to Step Three, the ALJ stated that he considered the requirements of Listing 112.11, but determined "[t]he claimant's severe impairments do not rise to the level of severity enumerated in this listing because the medical evidence fails to establish the requisite criteria set forth in paragraph B." *Id*. After setting forth the paragraph B criteria, the ALJ stated as follows: "I find that the claimant's difficulties in these areas do not rise to the 'marked' level, for the reasons set forth below." (Tr. 13.)

The decision then proceeds directly to a discussion regarding functional equivalence; i.e., the degree of B.B.'s limitations in each of the six functional domains. The ALJ first summarized Dodson's and B.B's hearing testimony and recounted the objective medical evidence, including Dr. Vandehey's and Dr. Sepahbodi's treatment records and Dr. Shamberg's consultative examination. (Tr. 13-16.) The ALJ then discussed, at some length, B.B.'s educational records, including his ETRs, IEPs, grades, and school disciplinary records. (Tr. 15-17.) The ALJ also considered the opinion evidence, according "great weight" to Dr. Sepahbodi's opinion; "moderate weight" to Dr. Shamberg's opinion; "great weight" to the opinions of the State Agency records-reviewing physicians; "moderate weight" to the letter submitted by Ms. Brown; and, "moderate weight" to opinions expressed by B.B's teachers,

23

school psychologists, and intervention specialists. (Tr. 15-17.)

The ALJ then analyzed this evidence in the context of each of the six functional domains, concluding that B.B. has less than marked limitations in the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, and ability to care for himself. (Tr. 17-22.) The ALJ also concluded B.B. has no limitations in the domains of moving about and manipulating objects, and health and physical well-being. (Tr. 21-23.)

While the ALJ's functional equivalence analysis is lengthy, the decision fails to explicitly discuss the basis of the ALJ's finding that B.B. does not meet or medically equal Listing 112.11. Indeed, although the decision states generally that "the medical evidence fails to establish the requisite criteria set forth in paragraph B," the ALJ does not explain how that evidence relates to the Listing's paragraph B criteria; i.e, cognitive/communicative functioning; social functioning; personal functioning; or concentration, persistence, or pace. In sum, the ALJ does not discuss the medical evidence and compare it to the paragraph A or B criteria of Listing 112.11, nor does he otherwise clearly articulate his basis for finding that B.B. does not "meet" the requirements of this Listing.

Although not cited by either party herein, numerous courts in this Circuit have addressed the situation where an ALJ conducts a functional equivalence analysis at Step Three but fails to consider whether a child "meets" or medically equals a listing. These courts have consistently held that "an ALJ's functional equivalence analysis does not suffice to substitute for the Step Three meets or [medically] equals analysis." *Taylor ex rel. S.T. v. Colvin*, 2013 WL 3280314 at * 7 (N.D. Ohio June 27, 2013). *See also Layton v. Colvin*, 2013 WL 5372798 at * 8 (E.D. Mich. Sept. 25, 2013) ("The ALJ's discussion of the six domains of functional equivalence does not 'stand in' for the analysis required to find that the claimant did not meet or equal the listings"); *Campbell ex rel. M.B. v. Comm'r of Soc. Sec.*, 2014 WL 51334 at * 7 (N.D. Ohio Jan. 6, 2014) ("Further, the mere existence of a functional equivalence discussion does not, of itself, substitute for the direct analysis of whether a listing has been met"); *Alworden ex rel. K.L.A. v.*

24

*Comm'r of Soc. Sec.*, 2011 WL 1118611 at * 6 (W.D. Mich. Jan. 24, 2011) (reversing and remanding because "[w]hile the ALJ's decision provides a lengthy discussion of whether plaintiff's condition is functionally equivalent to a listing under 40 C.F.R. Section 416.926a, he failed to provide a meaningful discussion of whether plaintiff's condition met the requirements of Listing 112.06A.3"). *M.G. v. Comm'r of Soc. Sec.*, 861 F.Supp.2d 846, 858-859 (E.D. Mich. 2012) (collecting cases); *Evans ex rel. DCB v. Comm'r of Soc. Sec.*, 2012 WL 3112415 at *9 (E.D Mich. March 21, 2012) (collecting cases); *Ray ex rel. A.K.D. v. Colvin*, 2014 WL 4365109 at * 12 (N.D. Ohio Sept. 2, 2014); *Peshek ex rel. N.R. v. Comm'r of Soc. Sec.*, 2014 WL 5684386 at * 17 (N.D. Ohio Nov. 4, 2014). Rather, these courts have found that "[t]he ALJ is required to evaluate and make separate determinations on whether Claimant's impairments meet, medically equal, or functionally equal the listings." *Layton*, 2013 WL 5372798 at * 8.

Nonetheless, "an ALJ's failure to explain how he reached his Step Three meets or equals conclusion can constitute harmless error where the review of the decision as a whole leads to the conclusion that no reasonable fact finder, following the correct procedure could have resolved the factual matter in another manner." *Woodall v. Colvin*, 2013 WL 4710516 at * 12 (N.D. Ohio Aug. 29, 2013) (citing *Hufstetler v. Comm'r of Soc. Sec.*, 2011 WL 2461339 at * 10 (N.D. Ohio June 17, 2011)). Where "concrete factual and medical evidence" is "apparent in the record" such that a court can discern how the ALJ "would have" reasoned, the outcome should be affirmed. *Layton*, 2013 WL 5372798 at * 8. *See Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 656 57 (6th Cir. 2009); *M.G.*, 861 F.Supp.2d at 860. Under these circumstances, some courts have examined the record to determine whether the same disability outcome would have resulted had the ALJ expressly compared the evidence to the listings. These courts have proceeded cautiously, however. As one district court explained:

> The Court will not find the ALJ's procedural error harmless merely because substantial evidence exists in the record that could uphold the ALJ's decision. *See M.G.*, 861 F.Supp.2d at 860. In *Rabbers v. Commissioner of Social Security*, the Sixth Circuit warned that it may be difficult or impossible to determine whether an error is harmless when the record contains "conflicting

25

> or inconclusive evidence" not resolved by the ALJ or "evidence favorable to
> the claimant that the ALJ simply failed to acknowledge or consider." 582 F.3d
> at 657 68. This Court cannot speculate as to how the ALJ might have
> weighed such evidence. *See M.G.*, 861 F.Supp.2d at 860 61.

*Layton*, 2013 WL 5372798 at * 8.

Here, the Commissioner does not argue that the ALJ's failure to articulate a meets or medically equals analysis constitutes "harmless error." Indeed, the Commissioner does not acknowledge either that the ALJ was required to conduct a separate meets or medically equals analysis, or that he failed to do so. Rather, the Commissioner simply glosses over this issue, citing evidence discussed by the ALJ as part of his functional equivalence analysis and arguing that it also demonstrates B.B. does not meet the paragraph B criteria of Listing 112.11.

The Commissioner's approach may stem from the fact that the decision states B.B. does not meet or medically equal the Listing "for the reasons stated below," i.e., in the functional equivalence analysis. In other words, the ALJ appears to treat the meets/equals analysis as being duplicative of, or encompassed by, the decision's functional equivalence discussion. This is directly contrary, however, to the cases cited above that find that "[t]he ALJ is required to evaluate and make separate determinations on whether Claimant's impairments meet, medically equal, or functionally equal the listings." *Layton*, 2013 WL 5372798 at * 8. Indeed, if separate determinations were not required, it would imply that the specific requirements of a listing are merely duplicative of the six functional domains. The Commissioner cites no law to this effect, and the Court is not persuaded that the meets or equals analysis at Step Three is purely redundant to the functional equivalence determination.

In any event, in the instant case, the Court is not inclined to find that the ALJ's failure to conduct a separate meets or medically equals analysis constitutes harmless error. As noted above, the Commissioner does not expressly advance this argument or provide any explanation, in the context of the case law cited above, why the ALJ's failure in this regard is harmless. It is not the Court's role to craft this argument on the Commissioner's behalf. More importantly, and

as discussed below, the Court finds there is "conflicting or inconclusive evidence" not resolved by the ALJ and "evidence favorable to the claimant that the ALJ simply failed to acknowledge or consider" that prevents a finding of harmless error. *See Layton*, 2013 WL 5372798 at * 8 (observing that "it may be difficult or impossible to determine whether an error is harmless when the record contains 'conflicting or inconclusive evidence' not resolved by the ALJ or 'evidence favorable to the claimant that the ALJ simply failed to acknowledge or consider'")(quoting *Rabbers,* 582 F.3d at 657  68.)

The first paragraph B criteria of Listing 112.11 is marked impairment in age-appropriate cognitive/communicative function.  Listing 112.00 provides that "[a] primary criterion for limited cognitive function is a valid verbal, performance, or full scale IQ of 70 or less."  20 C.F.R. Part 404, Subpart P, App. 1, Listing 112.00(C)(2)(a).  In the instant case, while the ALJ acknowledges that B.B. was found to have a full scale IQ of 78 in October 2007, he fails to address the fact that B.B. was administered the WISC-IV test again in 2010 and found to have a full scale IQ of only 72.  (Tr. 204.)  Nor does the ALJ acknowledge that, in both of these IQ tests, B.B. scored 70 or below in terms of his processing speed IQ, scoring a 70 in 2007 and only a 68 in 2010.  (Tr. 204, 550.)  The ALJ does not address this evidence or otherwise discuss how it relates to the degree of B.B.'s impairment in cognitive/communicative function.

Similarly, with respect to the paragraph B criteria of concentration, persistence or pace, the Court notes Dr. Sepahbodi opined that B.B. had difficulty sustaining concentration and persistence.  (Tr. 16, 430.)  The ALJ acknowledged this opinion and purported to accord it great weight, noting that "[o]verall, [Dr. Sepahbodi's] opinion is consistent with other evidence in the record, such as the claimant's individualized education programs that reflect his difficulty with organization and staying on task in school."  (Tr. 16.)  There is no explanation in the decision, however, regarding how Dr. Sepahbodi's finding in this regard relates to the paragraph B criteria of concentration, persistence, or pace.  This is particularly troubling in light of the repeated references in the record to B.B.'s long-standing difficulties with attention to task completion in

27

both the medical and educational records.

In light of the above, the Court cannot conclude that the ALJ's failure herein to conduct a separate meets or medically equals analysis constitutes harmless error.[7]  Rather, under the circumstances, the Court finds remand is necessary to allow the ALJ to determine, in the first instance, whether B.B. meets or medically equals Listing 112.11.  As another district court within this Circuit has explained,

> . . .where, as here, the ALJ fails to complete a required step in the [sequential] analysis, the proper course is to remand the case for him to complete his task.  Requiring a reasoned and explained conclusion [at Step Three] is not merely a formalistic requirement.  On the contrary, as noted by the Sixth Circuit, it is a necessary component for this Court to ascertain whether the ALJ's decision was supported by substantial evidence.  It is not for the Magistrate Judge to step into the shoes of the ALJ and complete his job for him.  The ALJ should, in the first analysis, assess whether the evidence put forth shows that Plaintiff meets or equals a Listing.  Should he determine she does not, the ALJ must explain his decision with a discussion and analysis of the evidence.

*Risner v. Comm'r of Soc. Sec.*, 2012 WL 893882 at *5 (S.D. Ohio March 15, 2012).  *See also Capizzi v Colvin*, 2015 WL 5117698 at * 5 (S.D. Ohio Sept. 1, 2015) (same);  *Bolla v. Comm'r of Soc. Sec.*, 2012 WL 884820, at *6  8 (E.D. Mich. Feb. 3, 2012) (finding the ALJ's Step Three analysis insufficient, and remand appropriate, in part because the "ALJ's lack of narrative deprives the federal court of its ability to act as an appellate tribunal and instead forces the court to become the finder of fact....").

Accordingly, and for all the reasons set forth above, the Court finds remand is necessary to permit the ALJ the opportunity to fully explain the basis for his finding that B.B. does not meet or medically equal Listing 112.11.  In light of this finding, and in the interest of judicial

---

[7] The opinions of state agency records-reviewing physicians (Drs. Goldsmith and Swain) state summarily that "Impairment or Combination of Impairments in Severe, but Does Not Meet, Medically Equal, or Functionally Equal the Listings Based on Example."  (Tr. 79, 90.)  While these physicians conduct a functional equivalence analysis of the six domains, they do not separately analyze the evidence in the context of the paragraph A and B criteria of Listing 112.11.  *Id.*

economy, the Court will not reach Dodson's second assignment of error, i.e., that the ALJ erred in finding that B.B. did not functionally equal the listing. However, to the extent the ALJ's analysis of the record on remand leads to factual findings that would materially affect the existing functional equivalence analysis, the ALJ should alter that analysis accordingly.

### VII. Decision

For the foregoing reasons, the Court finds the decision of the Commissioner is not supported by substantial evidence. Accordingly, the decision of the Commissioner is VACATED and the case is REMANDED for further proceedings consistent with this Opinion.

IT IS SO ORDERED.

s/ Greg White
United States Magistrate Judge

Date: February 11, 2016